Danny R. CALVERT, Appellant,

v.

STATE of Iowa, Appellee.

No. 65009.

Supreme Court of Iowa.

Sept. 23, 1981.

James Cleary, Des Moines, for appellant.

Thomas J. Miller, Atty. Gen., and Roxann M. Ryan, Asst. Atty. Gen., for appellee.

HARRIS, Justice.

We affirm the trial court's denial of post-conviction relief. Petitioner's challenge is to probation revocation proceedings, which he attacks on sufficiency of evidence grounds and on a constitutional basis. Cal-

vert previously entered guilty pleas to two charges of larceny of a motor vehicle in violation of section 321.82, The Code 1975. He was sentenced to two indeterminate terms of not to exceed ten years, to run concurrently, and was granted bench probation in each case. He was on probation for about 14 months.

Calvert was later arrested on a charge of operating a motor vehicle without the owner's consent, an aggravated misdemeanor under section 714.7, The Code 1981. This arrest precipitated the probation revocation proceeding. Hearing was held on notice at which Calvert appeared with counsel.

Four witnesses testified. A probation officer told of Calvert's arrest on the new charge and told of the witness's filing the report of probation violation. On cross-examination the officer stated his recommendation of revocation would depend on a finding that Calvert had in fact operated the motor vehicle without the owner's consent.

A Des Moines police officer testified that, at about 9:15 p. m. March 16, 1978, he observed a white and red Chevrolet van parked in an unusual place and then being driven away with its lights out. Upon completion of an assigned trip he returned and located the van in a parking lot across from the Red Horse Armory. Checking the van he found a 16 year-old female in it. After talking with her the officer observed footprints in the snow from the van toward the armory. He noted the front end of the van was damaged, including both headlights which were knocked out. The license number was CJ8530. He saw two sets of gloves in the van.

The juvenile also testified. She said she had been keeping company with Calvert for several months before that night. At about 8:15 on the same night Calvert came to her home driving a white Bell Brothers van with its front end "smashed up." Calvert told her he drove the van through a fence when he stole it and said he was wearing gloves while driving the van to avoid leaving fingerprints. She also quoted Calvert as saying he was driving down to the ar-

mory to get headlights from an armory truck. She said Calvert climbed over a fence at the armory and ran away when the police arrived.

On cross-examination the juvenile said she dropped out of school in ninth grade. She had been in juvenile court and was released to her mother. She believed nothing would be done against her unless she got into some trouble within 90 days. She was not a willing witness, but no threats or promises had been made to obtain her testimony. In response to questions by the judge at the revocation proceeding, the juvenile's mother said her daughter had not been in court before and was "scared half sick." But there was no indication she would lie.

The president of Bell Brothers Heating and Airconditioning Company testified that the company owned a white red-lined Chevy van, license number CJ8530. It was parked on company property within a chain-link fence with the gate locked. It was taken without permission and driven through the fence. It was later found by the police. The witness stated categorically that he did not know Calvert and that Calvert certainly had no permission to take or drive the van.

■ I. Calvert believes there was insufficient competent evidence to support the probation revocation. The crux of this contention, his first assignment of error, is Calvert's assertion that the juvenile was incompetent to testify. Under Iowa R.Crim.P. 19(1), the rules for determining competency of witnesses in civil cases are applied to criminal proceedings. Section 622.1, The Code, provides that "[e]very human being of sufficient capacity to understand the obligation of an oath is a competent witness in all cases...." That understanding was described as follows:

Competency of a witness to testify under this statute or his capacity of communication has two aspects: (1) the mental capacity to understand the nature of the questions put and to form and communicate intelligent answers thereto and (2)

the moral responsibility to speak the truth, which is the essence of the nature and obligation of an oath. [Authorities.] *State v. Harvey*, 242 N.W.2d 330, 336 (Iowa 1976). We do not disturb a trial court's determination that a witness is or is not competent in the absence of a showing that the trial court abused its discretion. *State v. Paulsen*, 265 N.W.2d 581, 586 (Iowa 1978).

■ The record here falls far short of showing any such abuse. The challenged testimony, corroborated in many important respects by the testimony of others, described the van, detailed where it came from, described its damaged condition, explained the reason it was near the armory, the reason for the presence of gloves, and the details of the witness's encounter with Calvert. The witness was plainly competent to testify. The postconviction trial court was clearly correct in rejecting Calvert's contention to the contrary.

■ ·Calvert also asserts that Iowa R.Crim.P. 20(3) (corroboration of testimony of accomplice required) applies to probation revocation proceedings and urges there was no such corroboration here. He is wrong on both counts. Rule 20(3) has no application to probation revocation proceedings. Such proceedings can be informal, even summary. *State v. Hughes*, 200 N.W.2d 559, 561–62 (Iowa 1972).· The requisite degree of proof is a preponderance of evidence. *Id.* at 563. The preponderance can be achieved without corroboration testimony.

■ In any event, there was ample corroboration under the test we explained in *State v. Harrington*, 284 N.W.2d 244, 248 (Iowa 1979).

Calvert's first assignment is without merit.

II. For his second assignment of error Calvert urges he was "denied his right to due process of the law as guaranteed by the Fourteenth Amendment to the United States Constitution due to the [revocation] court's penalizing [him] for his exercise of his right not to incriminate himself as guaranteed by the Fifth Amendment to the United States Constitution." This conten-

tion challenges a position taken by the trial court at the revocation proceeding. The State had first made the showing we previously described. Following the testimony of the four witnesses, the court addressed Calvert and his counsel as follows:

Mr. Arvidson [defendant's counsel at the revocation proceeding], I'm sure you are acquainted with my view of the law that, in a probation revocation proceeding, where the evidence appears *prima facie* to point to the commission of [a crime] or [other] violation of probation, the court expects to hear from the defendant. And, if it does not hear from him, it may draw inferences against him.

Calvert did not testify and it is likely that his silence was a factor in the determination that his probation should be revoked. The question now presented is one mentioned but not reached in *Rheuport v. State*, 238 N.W.2d 770, 773 (Iowa 1976). Can the failure of the accused to testify at a revocation proceeding be used against him? Historical background for the question was carefully described in Farb, Catch–22: *A Probationer's and Parolee's Choice Between the Right to be Heard and the Privilege Against Self-Incrimination*, 9 Pac.L.J. 949, 952–53 (1978):

Prior to 1972, no procedural protections were required to be given to parolees or probationers at revocation hearings. Three theories were advanced by the courts to support this lack of protection: (1) the defendant had "contracted" for his conditional liberty and in so doing had consented to a summary revocation hearing; (2) the rehabilitative goals of the state, acting as *parens patriae*, coincided with the individual's own interest and therefore no procedural safeguards were needed to protect the individual; and (3) the defendant remained in "constructive custody" and therefore revocation of conditional liberty involved no substantial incursion on the defendant's freedom. Parole and probation were considered "acts of grace" to which the defendant had no right; therefore, revocation was not punishment but withdrawal of that privilege and thus not subject to the pro-

cedural due process requirements of the Constitution.

In 1972, in *Morrissey v. Brewer*, [408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)], the United States Supreme Court rejected the above theories and extended due process principles to parolees, and a year later to probationers in *Gagnon v. Scarpelli* [411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973)]. The Court in *Morrissey* and *Gagnon* stated that a defendant in either a probation or parole revocation proceeding is constitutionally entitled to: (1) written notice of the claimed violations; (2) disclosure of the evidence against the defendant; (3) an opportunity to be heard in person and to present witnesses and documentary evidence; (4) a right to confront and cross-examine adverse witnesses unless the hearing officer specifically finds good cause for not allowing confrontation; (5) a neutral and detached hearing body; and (6) a written statement by the factfinders as to the evidence relied on and the reasons for revoking parole or probation.

While these requirements have emerged to define how much process is constitutionally due a parolee or probationer in revocation hearings, the courts presently have not articulated the approach or methodology employed in arriving at these minimal procedural safeguards mandated by the federal constitution. The Supreme Court and courts in various jurisdictions have devised several tests to ensure the constitutional validity of procedures that compel a defendant to choose between testifying at a hearing, thus risking self-incrimination at a later trial, or declining to testify, thus forfeiting the right to speak in his own defense. (Footnotes omitted.)

In *Baxter v. Palmigiano*, 425 U.S. 308, 320, 96 S.Ct. 1551, 1559, 47 L.Ed.2d 810, 822 (1976), the United States Supreme Court determined that the rule in *Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106, 110 (1965) (forbidding a jury from drawing an inference of guilt from a defendant's failure to testify) was inapplicable to prison disciplinary hearings.

*Baxter* acknowledged that the inmate's silence, in and of itself, was insufficient to support an adverse decision by the disciplinary board, but the case is nevertheless clear authority for the action of the revocation court:

... Palmigiano remained silent at the hearing in the face of evidence that incriminated him; and, as far as this record reveals, his silence was given no more evidentiary value than was warranted by the facts surrounding his case. This does not smack of an invalid attempt by the State to compel testimony without granting immunity or to penalize the exercise of the privilege. The advice given inmates by the decision-makers is merely a realistic reflection of the evidentiary significance of the choice to remain silent.

425 U.S. at 318, 96 S.Ct. at 1557, 47 L.Ed.2d at 821. Other courts take the same view. *Ryan v. State of Montana*, 580 F.2d 988, 991 (9th Cir. 1978); *United States v. Farmer*, 512 F.2d 160, 162 (6th Cir. 1975); cited in *Rheuport*, 238 N.W.2d at 773; *Flint v. Mullen*, 499 F.2d 100, 105 (1st Cir. 1974); *People v. Lee*, 88 Ill.App.3d 396, 43 Ill.Dec. 646, 410 N.E.2d 646, 648 (Ill.App.1980).

Calvert cites a number of authorities in his challenge to the revocation court's use of his silence. But the cases he cites deal mainly with a question which we need not and do not reach: what, if any, use is to be made of a probationer's testimony—given under the press of these circumstances—in a later criminal trial? Where a criminal trial results from the same event which prompts the revocation proceeding can the prosecution use any testimony given by the accused at the revocation hearing? The authorities respond in various ways.

It is sometimes suggested that the State should hold the violation hearing first and give the alleged [probation] violator use and derivative use immunity for any testimony he may give, or postpone the violation hearing until after the criminal trial. *State v. DeLomba*, 117 R.I. 673, 370 A.2d 1273, 1276 (1977); III ABA Standards Relating to Sentencing Alternatives and Procedures § 18–

7.5 (2d ed. 1980). One court held that, at the later criminal trial, any testimony of a probationer at a probation revocation hearing was inadmissible if the testimony was given after timely objection. This was the holding in *People v. Coleman*, 13 Cal.3d 867, 120 Cal.Rptr. 384, 533 P.2d 1024, 1042 (1975), as a judicial rule of evidence and not as a principle of state or federal constitutional law. In *Dail v. State*, 610 P.2d 1193, 1196 (Nev.1980), it was held:

> Except in a situation in which the state institutes revocation proceedings as a vehicle for an investigation directed solely toward obtaining information to be used in a subsequent criminal trial [Authority], or a situation where the proceedings were commenced without sufficient evidence to support the probation violation charge [Authority], we decline to require that a criminal trial be conducted prior to a probation revocation hearing. Here, the fact that the probation revocation hearing preceded the related criminal trial, violated neither appellant's due process rights nor public policy.

■ These authorities have nothing to do with the power of the revocation court to consider the silence of the accused after a *prima facie* showing of the crime. Under *Baxter*, the silence could be considered. There was no error in the action of the revocation trial court when it considered Calvert's silence. Calvert's contention to the contrary is without merit.

III. Calvert also argues he was "denied his right to due process of the law as guaranteed by the Fourteenth Amendment to the United States Constitution due to the probation revocation court's failure to allow him a meaningful opportunity to express factors in mitigation of a revocation decision." He points to the two-step test adopted in *Morrissey v. Brewer*, 408 U.S. 471, 479–80, 92 S.Ct. 2593, 2599, 33 L.Ed.2d 484, 493 (1972). In *Gagnon v. Scarpelli*, 411 U.S. 778, 786, 93 S.Ct. 1756, 1761, 36 L.Ed.2d 656, 664 (1973), the probationer is allowed an opportunity to participate in both steps.

■ In *Patterson v. State*, 294 N.W.2d 683, 684 (Iowa 1980), relying on *State v. Tech*, 240 N.W.2d 658, 661 (Iowa 1976), and *Rheuport v. State*, 238 N.W.2d at 773 (Iowa 1976), we pointed out that the two steps could be combined into a single hearing. This is now the procedure provided by section 908.11, The Code.

Calvert believes that he was present at the first step but was not allowed at a second step and that his absence violated his right to be present. We do not so read the record. Rather it appears that Calvert was invited to participate in both stages. There was indeed an off-the-record discussion in chambers which counsel, but not Calvert, attended. At the conclusion of that discussion the judge returned into open court and advised Calvert that he was in violation of his probation. The trial court then said:

> I wanted to give your attorney and the probation officer an informal opportunity to talk to the court about disposition and I wanted to have a chance to look at your presentence report that we got on you at the time you were sentenced and given probation. And out of all that, I cannot find any alternative other than to revoke your probation and to imprison you as you were ordered originally before the probation was granted.
>
> You don't have to, of course, but is there anything you want to say to the court? Is there any explanation that you feel you can give to the court for this?

The defendant answered that he did not. We believe there was substantial compliance with the two-step requirements of *Morrissey* and find no error.

We find no merit in any of Calvert's three assignments of error. The judgment of the trial court is affirmed.

AFFIRMED.